UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| RONALD RUBLE., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:19 CV 122 JMB |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security

Administration.  The parties have consented to the jurisdiction of the undersigned United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

On July 28, 2015, plaintiff Ronald R. protectively filed an application for a period of

disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., with an alleged onset

date of July 17, 2001.[1]  (Tr. 13, 251-52, 150).  After plaintiff's application was denied on initial

consideration (Tr. 162-65), he requested a hearing from an Administrative Law Judge (ALJ).  (Tr.

169-71).

---

[1] This is plaintiff's third application for disability benefits.  In October 2002, an ALJ approved plaintiff's
first application and found that plaintiff was disabled as of July 13, 2001.  (Tr. 126).  The Social Security
Administration later determined that plaintiff's disability ceased on August 1, 2010.  Id.  Plaintiff filed for
benefits again on August 7, 2012.  Id.  After hearing testimony from plaintiff, his community case worker,
two medical experts, and a vocational expert, the ALJ issued an unfavorable decision.  (Tr. 123-39).  This
Court affirmed the ALJ's decision on September 22, 2016.  See Ronald R. v. Social Security
Administration, 1:15 CV 141 (JMB) [Doc. # 18].

Plaintiff and counsel appeared for a hearing on December 11, 2017.  (Tr. 62-122).  Plaintiff testified concerning his disability, daily activities, functional limitations, and past work.  The ALJ also received testimony from vocational expert Susan Shea, M.A.  The ALJ issued a decision denying plaintiff's applications on March 9, 2018.  (Tr. 10-26).  The Appeals Council denied plaintiff's request for review on May 31, 2019.  (Tr. 6-9).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Prior ALJ Decision

The record before the Court includes the unfavorable decision on plaintiff's second application for benefits.  In that May 2014 decision, the ALJ found that plaintiff met the insured status requirements of the Social Security Act through December 31, 2015, and had not engaged in substantial gainful activity since February 25, 2012.  Plaintiff had severe impairments of degenerative joint disease of the lumbar spine and knees, chronic obstructive pulmonary disease (COPD), obstructive sleep apnea, recurrent foot calluses, residuals of status-post left carpal tunnel syndrome with surgical release, hypertension, ulcer, gastritis, obesity, mood disorder, post-traumatic stress disorder (PTSD), and learning disorder.  (Tr. 129).  He did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (Tr. 133).  The ALJ determined that plaintiff had the residual functional capacity (RFC) to perform light work, with exclusions on lifting or carrying more than 20 pounds occasionally and 10 pounds frequently; standing or walking more than 2 hours in an 8-hour workday; sitting more than 6 hours in an 8-hour workday; standing or sitting continuously without alternating position occasionally to stretch while remaining at the work station; ambulating over unimproved terrain; operating foot controls more than occasionally; climbing ladders, ropes, or scaffolds, kneeling, or crawling; stooping or

crouching more than occasionally; exposure to pulmonary irritants, extreme heat, cold, humidity, or whole body vibration; and performing more than simple, repetitive tasks with no close interaction with the general public or reading and writing.  (Tr. 134-37).  Plaintiff had no past relevant work, was a younger individual, had at least a high school education, and could communicate in English.  Considering plaintiff's age, education, work experience, and RFC, there were jobs in the national economy that he could perform, including collator operator and small parts assembler.  (Tr. 138).  Accordingly, the ALJ determined that plaintiff had not been under a disability from July 13, 2001 through May 29, 2014, the date of the decision.  (Tr. 138-39).

The ALJ here declined to reopen the May 2014 decision.  Thus, plaintiff was required to establish that he became disabled at any time after May 29, 2014, and before December 31, 2015, the date last insured.  (Tr. 13).  Plaintiff does not challenge the ALJ's decision not to reopen the prior decision.

### B.  Disability and Function Reports and Hearing Testimony

Plaintiff, who was born in December 1964, was 36 years old on his alleged onset date and 52 years old at the time of his hearing.  (Tr. 150, 38).  He graduated from high school and lived alone in a trailer.  (Tr. 57, 281).  He had been married and divorced twice.  (Tr. 342).  He worked as a laborer at a tarp factory from 1984 to 2000 and briefly as a maintenance supervisor at a prison in early 2001.  (Tr. 260).

Plaintiff claimed he was disabled due to pain caused by low back issues, shortness of breath, compound leg fracture in one leg and steel plate in the other, major depressive disorder, learning disability in reading comprehension, scorched lungs and burns sustained in a propane explosion, excessive sweating, memory issues, difficulty staying focused, and bleeding ulcer.  (Tr. 269).  In July 2015, he was prescribed the antidepressant Cymbalta, hydrocodone and lidocaine

3

patches for pain, an inhaler, the diuretic Lasix, and the blood pressure medication lisinopril.  (Tr. 272).   In November 2017, his medications included hydrochlorothiazide, lisinopril, the antidepressant Pristiq, lidocaine ointment, Prilosec for GERD, a nonsteroidal anti-inflammatory, and an inhaler.  (Tr. 304).  Some of his medications caused excessive sweating and tiredness.  (Tr. 287).

Plaintiff's August 2015 Function Report was completed with the assistance of community case manager Braden Bremmon.  (Tr. 281-91).  Plaintiff stated that he was unable to work because he could not sit or stand for any period of time, could not comprehend what he read, had memory issues, and experienced constant pain and breathing difficulty.  His sleep was interrupted by pain.  When asked to describe his daily activities, he stated that some days he stayed in bed.  He also stated that, even on days when he got up, he did not do anything, although he acknowledged that he took care of his three dogs.  He was able to attend to his self-care and hygiene, but it took him longer than it used to.  He prepared simple meals such as sandwiches and pizza, did laundry, washed dishes, cleaned, and used a riding mower to mow the lawn.  Unless he was depressed or in too much pain, he generally went outside every day.  He drove a car and went grocery shopping once a week.  He was able to pay bills, count change, and manage financial accounts.  His hobbies included listening to music and watching television.  Once a month, he went to the river to fish.  He used to hunt, but now it was too painful.  He visited with friends twice a week to talk about the weather and politics.  He routinely went to medical appointments, the grocery store, and a friend's house.  Plaintiff had difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, memory, completing tasks, concentrating, understanding, and following instructions.  He could walk 200 feet before needing to rest for 10 minutes.  He occasionally used a walking stick.  He followed spoken instructions better than written

4

instructions.  He had no difficulty getting along with others, including authority figures.  His ability to handle change and stress depended on the specific situation.

At his December 2017 hearing, plaintiff testified that he had an uneven gait because his left leg was shorter than his right as a result of an accident in which both legs were broken, and he had calluses on the bottoms of his feet.  When walking, especially on uneven ground, he felt as though his leg would hyperextend or "break backwards."  He also had pain in his low back and knees and his legs buckled if he stood too long and felt numb if he sat too long.  His activity level was affected by his pain and shortness of breath, so he did as many tasks as he could in short increments.  He washed one dish at a time, cleaned one room at a time, and climbed steps one at a time.  He used a grab bar to get in and out of the shower.  After his shower, he sat down to dress to the extent possible before standing to pull everything into place. When grocery shopping, he leaned on the cart and completed his shopping as quickly as possible.  He had enough strength to change the sheets on his king-sized bed and lift 50-pound bags of dog food.  After any particular task he had to elevate his legs.  He also used a lidocaine ointment on his legs and low back, which gave him some relief.   (Tr. 40-44, 48).

Plaintiff drove himself to his medical appointments, including to see his primary care provider who was 35 to 40 miles away.  (Tr. 49).   He saw a psychiatrist at the Family Counseling Center to deal with post-traumatic stress disorder.  He testified that he had "one tragedy after another," including a house fire which caused him severe injury and killed his girlfriend and a motor vehicle accident in which a child riding a four-wheeler died after running into the front of plaintiff's truck.  He suffered bad dreams, depression, and anxiety as the result of these traumas. (Tr. 51).  Plaintiff testified that there had been a period of time when he was so depressed and "tired of doing without" that he wanted "to go hurt other people."  (Tr. 53).  He started to go to

church on Sundays, and this helped stabilize his thinking.  Plaintiff also saw a community support worker who talked with him about his depression and helped him read his mail.

Vocational expert Susan Shea testified that plaintiff's six-month employment in 2001 as a maintenance supervisor was too short to be considered as past relevant work.  (Tr. 55).  The ALJ asked Ms. Shea about the employment opportunities for a hypothetical person of plaintiff's age and education, with no work experience, who was able to perform work at the light exertional level; who could occasionally climb ramps and stairs but never scaffolds, ladders, or ropes; and who could occasionally balance, stoop, kneel, crouch, and crawl.  The individual should avoid workplace hazards and concentrated exposure to environmental hazards.  In addition, the individual was limited to simple routine tasks outside a fast-paced production or quota environment such as an assembly line.  Finally, the individual was limited to occasional interaction with coworkers and the public and to work that required only occasional changes in the work setting.  Ms. Shea stated that such an individual could perform jobs available in the national economy, including light cleaner or housekeeper, light laundry worker, and light machine tender.  (Tr. 58).  These jobs could not be performed if the individual were instead able to perform only at the sedentary level, but other jobs would be available, including sedentary table worker, sedentary machine tender, and sedentary hand assembler.  (Tr. 58-59).  Being off-task more than 15 percent of the workday or absent two or more days a month precluded employment.  (Tr. 59).  In response to  a question from plaintiff's counsel, Ms. Shea testified that all work would be precluded for an individual who had to shift from sitting to standing at unpredictable intervals, stand for two to ten minutes, and perhaps walk or move around.  (Tr. 60).  Ms. Shea stated that her testimony was consistent with the Dictionary of Occupational Titles (DOT), with the exception of information regarding time off-task and absences, which the DOT did not address.  Her testimony on these two

6

limitations was based on her "well over 25 years of doing job analyses and reviewing vocational research." (Tr. 59).

### C.   **Medical and Opinion Evidence**

Plaintiff submits a statement of material facts in which he sets out the medical evidence relevant to his claim. [Doc. # 19-1]. Defendant largely agrees with plaintiff's summation of the medical evidence, occasionally supplementing plaintiff's statement with additional findings in the particular medical record cited by plaintiff. [Doc. # 22-1]. The Court will adopt plaintiff's statement, as supplemented by defendant. By way of summary, the Court notes that the majority of plaintiff's treatment during the period under review was for the consequences of physical and psychological traumas he sustained earlier in his adult life. In July 2001, he underwent surgical open reduction and internal fixation of both lower legs following a motorcycle accident. (Tr. 129). In March 2009, he was ejected from a house when a propane tank exploded. (Tr. 129, 493-94). His girlfriend died in the ensuing fire. He sustained severe burns and lung damage and was in an induced coma for 72 days. (Tr. 493-94, 341). Finally, as mentioned above, he was involved in a motor vehicle accident in which a child died.

The medical record contains monthly treatment notes from the Advanced Pain Center[2] between May 2013 and February 2017. (Tr. 381-84, 385-88, 389-92, 393, 397-400, 401-04, 405-08, 409-12, 413-16, 417-20, 421-24, 425-28, 429-32, 433-36, 437-40, 441-45, 446-49, 450-52, 453-56, 457-60, 461-64, 465-68, 469-72, 473, 474-77, 478, 479-82, 483, 484-87, 488-91, 610, 604-06, 600-03, 597-99, 596, 593-95, 590-92, 587-89, 584-86, 581-83, 577-80, 574-76, 571-73, 567-70, 607-11, 564-66, 561-63, 559-60, 554-57, 549-52, 548). During this same period, plaintiff also had regular psychopharmacology reviews at the Family Counseling Center for treatment of

---

[2] Plaintiff's treatment with the Advanced Pain Center began in May 2012 and with the Family Counseling Center in January 2011. (Tr. 130-31).

his history of PTSD and depression.  (Tr. 335-37, 338-40, 341-43, 344-46, 347-49, 350-52, 353-55, 356-58, 359-61, 362-65, 366-68, 369-71, 372-75, 646-47, 648-51, 652-55, 656-57, 658-61, 662-63, 664-67, 668-69, 670-73, 674-77, 678-79, 680-83, 684-85, 687-90, 691-92, 693-94, 696-99).  Beginning in January 2015, he also had regular primary care appointments for treatment of high blood pressure and COPD at the Family Care Clinic.  (Tr. 314-26, 317-18, 319-20, 511-13, 514-17, 518-21, 522-25, 526-29, 530-33, 534-37, 627-30, 631-34, 635-38, 639-42).  Specific medical records will be discussed as necessary to address plaintiff's claims.

On October 27, 2015, State agency psychological consultant Scott Brandhorst, Psy.D., completed a Psychiatric Review Technique form based on a review of plaintiff's medical record through September 2015.  (Tr. 153-55).  Dr. Brandhorst concluded that plaintiff had medically determinable impairments in the categories of 12.04 (affective disorders) and 12.06 (anxiety-related disorders).  Dr. Brandhorst opined that plaintiff had mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  He had no repeated episodes of decompensation. Dr. Brandhorst noted that plaintiff had been in outpatient psychiatric treatment for several years and received community support services.  Examination notes routinely recorded that plaintiff was doing well and had a good appetite and fair energy, with some nightmares and flashbacks.  In mental status examinations, he was routinely alert and oriented, with goal-directed thought processes and fair insight and judgment.  His mood was generally euthymic.  He was assigned Global Assessment of Functioning (GAF) scores between 58 and 65.  After reviewing the medical records and plaintiff's daily activities, Dr. Brandhorst concluded that plaintiff's claimed functional limitations were not fully supported by the medical evidence and were only partially credible.  In particular, he did not appear to have any significant functional limitations arising from his learning

8

disability and comprehension and memory problems.  Dr. Brandhorst concluded that plaintiff
retained the ability to do simple repetitive tasks in a work setting.  (Tr. 154).  The ALJ gave Dr.
Brandhorst's opinion significant weight as "generally consistent with the totality of the evidence
of record."  (Tr. 23).  The ALJ nonetheless found greater limitations were warranted in order to
afford plaintiff some benefit of the doubt and to account for the change in criteria for assessing
mental conditions that took effect on January 17, 2017.[3]  Id.

Single Decision Maker Dawn Scherer completed a Physical Residual Functional Capacity
Assessment.  (Tr. 155-58).   She determined that plaintiff could lift or carry up to 20 pounds
occasionally and 10 pounds frequently, stand and/or walk for 6 hours in an 8 hour day, and sit for
6 hours in an 8-hour day.  He could occasionally climb ladders, ropes, scaffolds, ramps and stairs;
and occasionally balance, stoop, kneel, crouch, or crawl.  He should avoid even moderate exposure
to fumes and hazards.  The ALJ did not address Ms. Scherer's assessment.[4]

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act.
See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v.
Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to
engage in any substantial gainful activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or which has lasted or can be expected
to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c
(a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment

---

[3] The ALJ additionally excluded plaintiff from working in fast-paced, production, or quota environments,
and limited him to work that would require only occasional changes in the work environment.  (Tr. 18).

[4] The ALJ's RFC determination excluded climbing ladders, ropes, and scaffolds but permitted less than
concentrated exposure to fumes and pulmonary irritants.  (Tr. 18).

or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite [his] limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high."  Id.  Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider).  Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance.

11

Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. (Tr. 13-26).  The ALJ found that plaintiff met the insured status requirements through December 31, 2015, and had not engaged in substantial gainful activity between May 30, 2014,[5] and the end of 2015.  (Tr. 16).  At step two, the ALJ found that, through the date last insured, plaintiff had the severe impairments of osteoarthritis and osteopenia of the right knee and left tibia, degenerative disc disease of the lumbar spine, COPD, depression, anxiety, and history of PTSD.  Id.  The ALJ concluded that plaintiff's high blood pressure, GERD, and obesity were non-severe after finding "no persuasive evidence" that the conditions failed to improve with treatment or persisted at a level of severity for twelve continuous months.  Nonetheless, the ALJ considered the effect of plaintiff's non-severe impairments on his ability to function.  Id.  The ALJ also concluded that plaintiff's alleged learning disability for reading comprehension was "not a medically determined impairment on this record."  Id.  The ALJ determined at step three that, through the date last insured, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment, including listings 1.02 (major dysfunction of a joint); 1.04 (disorders of the spine); 1.06 (fracture of the femur, tibia, pelvis, or one or more of the tarsal bones); or 3.02 (chronic respiratory disorders).  (Tr. 17).  In addition, the ALJ found, plaintiff's mental impairments did not meet or equal the criteria of listings 12.04 (depressive, bipolar and

---

[5] Plaintiff was previously determined not to be disabled for the period between July 17, 2001, and May 29, 2014.  (Tr. 13).

related disorders); 12.06 (anxiety and obsessive-compulsive disorders); or 12.15 (trauma and stressor-related disorders). The ALJ analyzed plaintiff's mental impairments under the paragraph B criteria (20 C.F.R., Part 404, Subpart P, Appx. 1) and determined that plaintiff had mild limitations in the areas of understanding, remembering, or applying information. He had moderate limitations in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 17). Plaintiff did not meet the paragraph C criteria. Plaintiff does not challenge the ALJ's assessment of his severe impairments or the paragraphs B and C criteria.

The ALJ next determined that plaintiff had the RFC to perform light work, except that he could not climb ladders, ropes, or scaffolds. He could occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, and crawl. He could not work at unprotected heights, around moving mechanical parts or other such hazards, and could not have concentrated exposure to environmental hazards. He was limited to performing simple, routine tasks, but not in a fast-paced, production or quota environment such as an assembly line. He could have occasional interaction with coworkers and the public and was limited to work that would require only occasional changes in the work setting. (Tr. 18). In assessing plaintiff's RFC, the ALJ summarized the medical record, as well as plaintiff's written reports and testimony regarding his abilities, conditions, and activities of daily living. (Tr. 18-24). While the ALJ found that plaintiff's severe impairments could reasonably be expected to produce some of the alleged symptoms, the ALJ also determined that plaintiff's statements regarding the intensity, persistence, and limiting effect of his symptoms were "not entirely consistent with" the medical and other evidence. (Tr. 20). In particular, the ALJ stated that "the totality of the objective medical evidence of record is minimal at best," noting that treatment during the relevant period was minimal and there was "scant objective evidence and clinical signs" to support the alleged severity of plaintiff's physical or

13

mental impairments.  Id.  The ALJ concluded that, to the extent that plaintiff's daily activities were restricted, "they are restricted by [plaintiff's] choice and not by any apparent medical proscription."  (Tr. 23).  The ALJ also considered plaintiff's work history, noting that there was no evidence that he sought employment after August 1, 2010, when his disability benefits were ceased for medical improvement, and concluded "that there may be other reasons than [his] medical condition that factor into his employment situation."  Id.  Plaintiff does not challenge this assessment.

At step four, the ALJ concluded that plaintiff had no past relevant work.  (Tr. 24).  His age on his date last insured placed him in the "closely approaching advanced age" category.  He had at least a high school education and was able to communicate in English.  Id.  The transferability of job skills was not an issue because plaintiff had no past relevant work.  The ALJ found at step five that someone with plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in substantial numbers in the national economy, including cleaner/housekeeper, laundry worker, and machine tender.  (Tr. 25).  Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from July 17, 2001, the alleged onset date, through December 31, 2015, the date last insured.  (Tr. 25).

## V.  Discussion

Plaintiff argues that the exertional portion of the ALJ's RFC determination is not supported by "some medical evidence" and that the mental portion is not supported by substantial evidence.

### A.  The Exertional Portion of the RFC

The ALJ determined that plaintiff had the RFC to perform light work with additional postural and environmental limitations.

14

The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  SSR 96-8p, 1996 WL 374184 (July 2, 1996).  "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations."  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation and citation omitted).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007).  Nonetheless, there is no requirement that an RFC finding be supported by a specific medical opinion, Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016), or, indeed, any medical opinion at all.  See Stringer v. Berryhill, 700 F. App'x 566, 567 (8th Cir. 2017) (affirming ALJ's RFC determination even though there were no medical opinions).  Furthermore, the ALJ is not limited to considering only medical evidence in evaluating a claimant's RFC.  Cox, 495 F.3d at 619; see also Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved *only* by medical evidence, we disagree.") (emphasis in original).  The ALJ may also consider a claimant's daily activities, subjective allegations, and any other evidence of record when developing the RFC.  Hartmann v. Berryhill, No. 4:17-CV-002413-SPM, 2018 WL 4679737, at *6 (E.D. Mo. Sept. 28, 2018) (citing Cox, 495 F.3d at 619-20).  And, even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.  Cox, 495 F.3d at 620; 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006).  Plaintiff bears the burden of proving his RFC.  See Moore, 572 F.3d at 523.  Ultimately, the claimant is responsible for providing evidence

15

relating to his RFC and the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." Turner v. Saul, No. 4:18 CV 1230 ACL, 2019 WL 4260323, at *8 (E.D. Mo. Sept. 9, 2019) (quoting 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)).

In this case, the ALJ thoroughly reviewed the medical records and concluded that, between May 30, 2014, and December 31, 2015, there was "scant objective evidence and clinical signs to support the alleged severity" of plaintiff's complaints. (Tr. 20). The ALJ noted that, in April 2014, plaintiff complained to his pain management specialist that his back and leg pain rated at level 7 on a 10-point scale and was aggravated by all physical activity. (Tr. 429-32). An MRI of his lumbar spine was described as showing "significant stenosis and some bulging discs," although elsewhere it was described as showing "no significant stenosis and some bulging discs."[6] (Tr. 432, 490). On examination, plaintiff's cervical and thoracic spine showed normal ranges of motion, muscle strength, reflexes, and sensation, with no pain on palpation. His lumbar spine showed moderate tenderness in the center of the spine and around the facet joints, with radiation into both hips, down to his ankles, with worse pain on his left side, and symptomatic range of motion. Nonetheless, his muscle strength, reflexes, and sensation were normal. Plaintiff's medications — lidocaine patches, tramadol and hydrocodone-acetaminophen — made his pain tolerable and they were continued without change.

---

[6] No date is provided for this MRI and the report itself does not appear in the record. An MRI in September 2016 showed mild to moderate stenosis in the lumbar spine, along with mild to moderate degenerative disc disease. (Tr. 543). An MRI of the lumbar spine in July 2017 disclosed "no significant disc bulge or herniation" and mild desiccation of disc spaces, mild diffuse degenerative facet disease, and no spinal canal or neural foraminal stenosis. (Tr. 622). These later reports suggest that the MRI cited in April 2014 actually found "no significant stenosis."

Plaintiff's presentation was remarkably consistent across his monthly pain management sessions.  His pain level ranged between 6 and 8.  (Tr. 433-36,  437-40, 441-45, 446-49, 450-52, 453-56, 457-60, 461-64, 465-68, 469-72, 473, 474-77, 478, 479-82, 483, 484-87, 488-91, 610, 604-06, 600-03).  On occasion, he reported pain in his shoulder, ankles, or calf, but the findings of his physical examinations remained generally unchanged.   His medications also remained stable and in August 2015, he reported that they controlled his pain.  (Tr. 488-91).  It was routinely noted that he "adamantly" refused to consider injections and on one occasion that he rejected the offer of nonsteroidal anti-inflammatories to supplement his pain medications.  (Tr. 464).  On several occasions starting in August 2015, the examiner noted a disparity between plaintiff's reported pain level and his "affect, posture and activity." (Tr. 488-91, 604-06, 600-03, 597-99, 607-11).  As the ALJ noted, the record contains no evidence of atrophy, persistent muscle spasm, neurological defect, signs of nerve impingement, significantly abnormal imaging studies, positive straight-leg raising, or inflammatory signs.  (Tr. 21).   The medical evidence supports the ALJ's RFC determination.

Plaintiff argues that objective findings support his claims of disabling pain.  [Doc. # 19 at 4].  In particular, he cites a January 2015 x-ray of his left tibia-fibula showing cortical irregularity, diffuse bony demineralization, and possible incomplete bony bridging at the old fracture sight. (Tr. 321).  In January 2016, an x-ray of the left leg showed mild osteoarthritis and osteopenia, with a possible chronic avulsion fracture along with old healed tibial fractures.  (Tr. 499).  And, an x-ray of plaintiff's right knee showed mild to moderate tricompartmental osteoarthritis and osteopenia.  (Tr. 500).   The ALJ accounted for these findings by listing osteoarthritis and osteopenia of the right knee and left tibia among plaintiff's serious impairments.  The ALJ also noted that plaintiff had normal ranges of motion, no neurological deficits, and unremarkable

musculoskeletal findings, with the exception of a mild limp.  In addition, the ALJ observed that plaintiff walked in and out of the hearing room without significant difficulty and sat normally throughout the hearing, albeit with complaints of pain.  The ALJ concluded that plaintiff's conservative treatment modalities suggested adequate control of his pain complaints and stability in his clinical presentation.  (Tr. 21).

Plaintiff also cites the results of a consultative examination conducted in October 2015 by Barry Burchett, M.D.  (Tr. 493-96).  Dr. Burchett noted that plaintiff ambulated with a mild limp favoring his left leg, without requiring an assistive device.  His left leg was 3 cm. shorter than his right leg.  He had moderate calices on the left foot, on which he could not stand.  He had mild difficulty with tandem gait.  Nonetheless, plaintiff was stable at station and comfortable in both sitting and supine positions.  He had no muscle spasm or tenderness to palpation of the lumbar spine, and straight leg raising tests from sitting and supine positions were negative.  Plaintiff had normal ranges of motion at both shoulders, both elbows, both wrists, and both ankles.  He had full range of motion at both hips, with the exception of a slight reduction in forward flexion; he had full range of motion of his right knee, and a modest reduction of the left knee.  (Tr. 497-98).  Dr. Burchett assessed plaintiff with chronic left leg pain, recurrent low back pain without radiculopathy, emphysema/COPD, hypertension, and GERD.  Other than plaintiff's inability to stand on his left foot, Dr. Burchett did not identify any functional limitations.  Similarly, plaintiff does not specify any limitations greater than those in the RFC that he believes are supported by Dr. Burchett's findings.

Plaintiff argues that the RFC determination is improper because the record contains no opinions from acceptable medical sources.  He asserts that an ALJ is "not qualified to determine how raw medical findings affect an individual's functioning, but rather is tasked to obtain opinions

from medical professionals and determine an individual's RFC based upon those opinions as well as all evidence the plaintiff's file."  [Doc. # 19 at 5].  As noted above, however, there is no requirement that an RFC finding be supported by a specific medical opinion, <u>Hensley v. Colvin</u>, 829 F.3d 926, 932 (8th Cir. 2016), or, indeed, any medical opinion at all.  <u>See</u> <u>Stringer v. Berryhill</u>, 700 F. App'x 566, 567 (8th Cir. 2017) (affirming ALJ's RFC determination even though there were no medical opinions).  Plaintiff also argues, without providing specific examples, that the ALJ improperly drew her own inferences from the medical records.  Because an ALJ is not required to rely on medical opinion in formulating the RFC, the absence of such an opinion does not mean that the ALJ improperly drew inferences from the records.  <u>See</u> <u>Thompson v. Colvin</u>, 174 F. Supp. 3d 1080, 1087 (E.D. Mo. 2016) (affirming ALJ's RFC determination over plaintiff's objection that there was no opinion from a physician and that the ALJ improperly drew his own lay conclusions regarding his abilities).  Plaintiff cites <u>Lund v. Weinberger</u>, 520 F.2d 782, 785 (8th Cir. 1975), for the proposition that an "administrative law judge may not draw upon his own inferences from medical reports."  <u>Lund</u> is distinguishable, however, in that Lund's doctor stated that he did "not know of any jobs that would not increase his headaches and neck pains."  <u>Id.</u>  The Eighth Circuit held that the ALJ erred in concluding that, contrary to the physician's opinion, Lund could perform light work.  Here, by contrast, no medical provider stated that plaintiff was unable to work or even imposed limitations on his physical activities.

The Court finds that the ALJ's assessment of plaintiff's exertional RFC is supported by substantial evidence in the record as a whole.

### B.    <u>The Mental Portion of the RFC</u>

Plaintiff argues that the ALJ's assessment of his mental capacities in formulating the RFC is not supported by substantial evidence because the ALJ gave significant weight to the opinion of

non-examining psychologist Dr. Brandhorst.  Plaintiff cites Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004), for the proposition that "the opinions of non-examining, consulting physicians standing alone [are not considered] 'substantial evidence.'" (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)).  As in Harvey, however, the ALJ here did not rely solely on Dr. Brandhorst's opinion to reach her conclusions.

The ALJ reviewed the records of plaintiff's mental health treatment, noting that "[o]verall, the totality of the medical records consistently document normal mental status examinations without any specific mental health complaints."  (Tr. 22).  Further, the record before the date last insured did not contain any specific ongoing complaints of depression, anxiety, PTSD, or nightmares.  Id.  The ALJ's assessment is supported by the medical records: throughout the relevant period, plaintiff's mood was neutral or euthymic, with the exception of depressed mood in August 2013,[7] which is before the relevant period, and December 2015, after the death of his grandmother.  (Tr. 338-40, 652-55).  The other components of his mental status examinations were unvarying:  He had goal-directed, linear, and coherent thought processes; normal speech; and normal perceptions.  His sleep was "ok," his energy "fair," and his appetite "good."  His judgment and insight were routinely described as fair.  (Tr. 335-37, 341-43, 344-46, 347-49, 350-52, 353-55, 356-58, 359-61, 362-65, 366-68, 369-71, 372-75, 648-51, 658-61, 664-67).  He was variously described as psychologically or emotionally stable and as coping well.  (Tr. 347-49, 353-55, 356-58, 362-65, 366-68, 369-71, 648-51, 680-83, 687-90).  The ALJ noted that plaintiff's GAF scores

---

[7] Plaintiff's psychiatric care provider, Kathleen Lasar, PMHNP-BC, noted that plaintiff wanted to change providers.  (Tr. 340).  In September 2013, plaintiff told psychiatrist Juan Carlos Salazar, M.D., that he wanted to change providers due to side effects of medication changes made by Ms. Lasar.  Dr. Salazar noted that plaintiff was actively seeking help with his disability application and that Ms. Lasar's "paperwork" was disregarded because she was a nurse practitioner.  (Tr. 3141).

ranged between 58 and 65, which suggested mild to moderate limitations in functioning.[8]  (Tr. 22).

In this case, Dr. Brandhorst's opinion was consistent with the medical record and the ALJ did not

err in giving it significant weight.  See Mabry v. Colvin, 815 F.3d 386, 391 (8th Cir. 2016) (ALJ

did not err in relying in part on evidence from state-agency non-examining physicians).

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is supported by

substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of July, 2020.

---

[8] The ALJ also noted that GAF scores have limited value as opinion evidence because they are snapshot estimates of an individual's level of functioning, they have a subjective component, and vary between providers.  (Tr. 23-24).